By the Oowrt,

Nelson, C. J.
One of the principal questions in the case, and which goes to the whole cause of action, is, whether the defendant is bound by his subscription for a share of the property, and liable for the payment of the same, before the whole number of shares into which it is divided have been subscribed for:—in other words, whether the proposition of the plaintiff for a sale upon the terms and in the manner stated in the articles is to be regarded as continuing open and unaccepted, so as not to be obligatory upon any party till the twenty-three shares were taken-up.
A solution of the question will depend upon a careful examination of the several provisions contained in the articles, and the intent of the parties as derivable therefrom. Among the recital are the following:—“ Whereas the said Lewis H. Sandford has proposed and agreed to divide the said lands *365 into twenty-three shares of $5000 each, estimating the value of the same in the aggregate, free and clear from all incumbrances, at $115,000, and to sell the said property at that price to such persons as shall subscribe for said shares, reserving to himself the right of subscribing two shares of said property.” “ And whereas the undersigned have severally, each for himself, and not jointly, agreed to become interested in the purchase of the said property at said price, to the extent of the number of shares set opposite to their respective names,” &e. The proposition is to sell the whole property at the fixed sum of $115,000, dividing it into twenty-three shares of $5000 each. The only qualification is the reservation to the plaintiff of the right to subscribe two shares. With this exception, a sale of the entire property described is contemplated, and must have been so understood by all persons taking an interest therein. Independently of the broad proposition for a sale of the whole *the reservation of the right to retain [ *478 ] two shares, necessarily implies that such was the intent. It is true the persons subscribing are not to be jointly personally responsible for payment of the purchase money. Each is made severally liable to the extent of his interest; but there is no incompatibility in this arrangement with the previously avowed intent to make sale of the whole.
The time and manner of payment (pursuing the articles') are then prescribed, and careful provision is made for the security and ultimate satisfaction of the purchase money:—45 per cent, is to be secured by the notes, and the balance of 55 in the bonds of the several subscribers. The title of the property it to be conveyed to a trustee for the benefit of the subscribers, according to the amount of their several interests, and the property is to be “ managed, sold, and conveyed at such time, in such manner, and for such prices as a majority of the subscribers shall direct; each share being entitled to a vote.” The plaintiff is to act as the agent in managing and disposing of the property; he also agrees to discharge all incumbrances out of the purchase money, and if he fail to do so at the request' of the trustee, then the latter is to discharge them out of the first sales made, and credit the same upon the bonds, which, by a previous stipulation, are to be lodged with him. The interest of the subscribers in the property is to be retained by the trustee as security for the payment of the several notes and bonds; and no subscriber is to be entitled to any part of the proceeds of the sales until the amount agreed to be paid to the plaintiff for the property shall be fully received by him; or until the incumbrances shall be first satisfied, and the balance of the purchase money paid.
These several provisions, embracing the body of the agreement between the respective parties, are skillfully arranged to carry out fully and effectually the projected sale of the entire interest. They provide for the transfer of the whole to a common trustee for the benefit of the subscribers to the *366 shares on the one side: and the security and payment of the §115,000, the purchase money on the other; and manifestly contemplate a full [ *479 ] subscription of the shares, as the basis *upon which the scheme of the projected disposition is founded. In theory the property is thrown into common stock of twenty-three equal shares, at the price of §115,000, with inducements for the formation of a company to fill up the same. When the whole number of shares are taken, the association to become complete, and bound by the terms and conditions of the contract under which it is formed.
Independently of the general arrangment and scope of the contract, which leads directly to this conclusion, there are one or two clauses that seem to me decisive of the question. The 4th provides “ that the property shall be managed, sold, and conveyed, at such time, in such manner, and for such prices, as a majority of the subscribers shall direct; each share being entitled to a vote. ” The shares referred to are the twenty-three into which the property had been previously divided. The power to manage and dispose of the same is here vested absolutely in the subscribers; they direct the time, price and manner of sale, each share entitled to a vote. A majority may decide, but as the power is of a private nature, I apprehend all the subscribers must be present, unless otherwise agreed, 6 Johns. R. 89. Where an authority is confided to several persons, for a private purpose, all must join in the act, unless provision is made for a majority, and then all must be present. The same rule is now applied also to an authority of a public nature. 2 R. S. 458 §, 27. But be this as it may, the clause, when taken in connection with other points of the scheme, manifestly contemplates a subscription of the whole stock previous to its going into effect. The shares must necessarily be first taken by the subscribers before they can fulfill the duties imposed on them ; till then the contract of assoiations remains inchoate, and from the nature of it, incapable of execution.
To meet this view of the case, it has been argued, that the plaintiff is to be regarded as holding and representing the shares unsubscribed ; and hence there is no difficulty in carrying into effect the scheme though but one share had been taken. To this argument there are several conclusive answers : 1. The proposition was made by the plaintiff on one side, to the [ *480 ] subscribers, the purchasers, on the other, marking throughout separate, different, and opposite interests in the course of fulfilment, such as usually exists between a vendor and vendee in a complicated contract of sale. The character, situation, and interest of the respective parties are therefore totally different and distinct. The argument confounds terms clearly expressed and understood, and in effect leads to a change of the whole structure and scope of the agreement from that which it purports to be on its face. Besides, the reservation of the right to subscribe for two *367 shares precludes the idea of the plaintiff’s standing in the relation of subscriber without some express act to that effect, and then not beyond the two shares.
II. A slight consideration of' the scheme will shew that this limitation - constitutes a most material part, so far as concerns the rights of the subscribers. By giving effect to it the purchasers, under the 4th clause, possess the control and disposition of the property, as they should, and as is manifestly intended. They direct the time, price, and manner of sale: each share entitled to a vote. But following out the argument of the plaintiff, he might stop short after the subscription of 11 shares, hold the subscribers personally liable for the $55,000 of the purchase money, without their having the slightest control over the property, his imaginary, unsubscribed number, would constitute the majority ; in effect he would hold the character of both vendor and vendee. He would still retain the right to dispose of the property for such price and upon such terms as he saw fit; might part with it, at once, for the balance of the purchase money in despite of his associates. So in regard to the subscription of any number of shares short of a majority. This would be a most unreasonable interpretation of the agreement, and should not be yielded to except upon very explicit and positive provisions to that effect. The whole scope of it leads to the contrary conclusion.
This view is also confirmed when taken in connection with the 7th clause. That provides, the interest of the subscribers shall be retained by the trustee as security for the payment of the notes and bonds ; and no subscriber shall be entitled to any part of the proceeds of sale till the amount “agreed to be paid for the property shall be fully received, or [ *481 ] until the incumbrances shall be first satisfied, and the balance of the purchase money paid. It is quite clear from this clause that the subscribers could not acquire control over the proceeds of the property until the purchase money be all paid. Till then, the trustee had a right to retain them as security. These were not to go into their hands until the whole consideration money was received, or un;il the incumbrances were satisfied, and the balance of the purchase money paid. The clause amounts to an equitable mortgage upon the property for the whole amount, and thus far, the subscribers stand as sureties for each other.
I know it was argued that this clause should be taken distributively, and means only that a subscriber shall receive nothing till he had paid up his share; that after this he was entitled to a dividend; in other words, that the clause operated only as a lien upon the seperate interest of each. But, looking at the whole of it, it will be seen that the first part provides expressly for this separate lien. The interest of the respective subscribers shall be held and retained by the trustee as a security for the said Lewis, *368 for the payment of the several notes “ and bonds.” This pledged the separate interest of each for payment of his share. The succeeding part is more general, and forbids payment of any portion of the proceeds till the whole purchase money has been satisfied.' Such is the necessary import of the terms. The subscribers, therefore, do not stand simply in the relation of tenants in common, separately liable for the payment of their individual shares, because their separate interests are jointly holden to the plaintiff. No one can pay up his share and claim an assignment. It is bound for the whole purchase money, and must remain with the trustee till the whole has been satisfied. The clause shews clearly enough that the question is not one simply between the plaintiff and a subscriber, as the interest of the latter is intimately connected with the whole scheme, especially with a full subscription of the shares. Anything short of this, greatly enhances [ *482 ] his risk, as the unsubscribed balance falls exclusively upon the *proceeds of sale. For that, no personal security has been obtained.
Upon the whole, after the fullest consideration, it seems to me the defendant may well say this is not the association I agreed to become a member of; the original plan submitted has never been filled up, and is incapable of execution according to its terms and conditions. The association to which I assented, contemplated personal security for the whole number of .shares, abating two that the plaintiff might retain; the management and disposition of the property were to belong to a majority of the subscribers, not to the plaintiff; I am entitled, to the benefit of the personal security to insure satisfaction of the" purchase money, and incumbrances, and to the benefit of the subscribers as the constituted body to advise and direct the management and sale.
The above conclusion supercedes numerous other questions raised on the trial, and in respect to which it is needless to express an opinion. The circuís judge having overruled an objection we deem a valid one, a new trial must be granted.
New trial granted.